IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,383






JOHN ALLEN RUBIO, Appellant



v.



THE STATE OF TEXAS








ON DIRECT APPEAL FROM CAUSE NO. 03-CR-457-B


IN THE 138TH DISTRICT COURT


CAMERON COUNTY





 Price, J., delivered the opinion for a unanimous Court.


O P I N I O N



 Appellant was convicted in November 2003 of capital murder related to the killings
of his three children in March 2003. (1) Based on the jury's answers to the special issues set
forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the
trial judge sentenced appellant to death. (2) This Court reversed appellant's conviction and
sentence on direct appeal. (3) Upon retrial, appellant was again convicted of capital murder and
sentenced to death on August 2, 2010. Direct appeal to this Court is automatic. (4) After
reviewing appellant's four points of error, we find them to be without merit. Consequently,
we affirm the trial court's judgment and sentence of death.

INSANITY DEFENSE

 In appellant's fourth point of error, he argues that the jury's failure to find that he was
insane at the time of the offense is so against the great weight and preponderance of the
evidence as to be manifestly unjust. He appears to reason that the State's evidence did not
controvert his evidence of insanity because it focused on his rational conduct before and after
the offense rather than his irrational conduct at the precise time of the offense.

 It is an affirmative defense that, at the time of the conduct charged, the actor, as a
result of severe mental disease or defect, did not know his conduct was wrong. (5) An accused
is presumed to be sane and bears the burden of proving by a preponderance of the evidence
that he is insane. (6) The insanity defense focuses on whether the accused understood the nature
of his action and whether he knew he should not do it. (7) In the context of the insanity defense,
the word "wrong" means illegal. (8) If the accused knows that his conduct is "illegal" by
societal standards, then he understands that his conduct is wrong, even if, due to a mental
disease or defect, he thinks his conduct is morally justified. (9)

 The issue of insanity ultimately lies within the province of the jury with respect to the
credibility of the witnesses, the weight of the evidence, and the limits of the defense itself. (10) 
On appeal, we review the evidence in the light most favorable to the jury's finding. (11) Our
standard of review is whether, after considering all of the evidence relevant to the affirmative
defense, the judgment is so against the great weight and preponderance of the evidence as
to be manifestly unjust. (12)

 In this case, the trial record contains evidence that appellant was legally insane at the
time of the offense, but it also contains substantial evidence that he was not legally insane. 
The evidence presented at trial included the testimony and prior statements of appellant's co-defendant, Angela Camacho, and appellant's statements to police. Additionally, appellant
presented the testimony of his relatives and close friends, other witnesses who had observed
appellant interacting with Camacho and the children, and two mental health experts. The
State presented the testimony of law enforcement officials, an inmate who was housed near
appellant, and a mental health expert.

 Camacho testified that at the time of the offense, she and appellant had three children: 
Julissa Quesada, who was three years and one month old; John Esteban Rubio, who was one
year and two months old; and Mary Jane Rubio, who was about two months old. Appellant
was not the biological father of Julissa and John, but he treated them as if they were his own
children.

 Camacho and appellant began dating after she left Julissa's father, who beat her. She
was pregnant with John at that time. Initially they lived in an apartment with appellant's
mother and brothers, but when that arrangement ended, they began living on the street. John
was born in January 2002. They eventually moved into a house that had no electricity and
no running water. During this period, appellant once asked Camacho what she would do if
he killed the children. She did not answer him because she thought that he was joking.

 In the summer of 2002, Child Protective Services ("CPS") removed Julissa and John
from the home and placed them with Camacho's mother. Camacho was pregnant with Mary
Jane at that time. In order to get Julissa and John back, Camacho and appellant had to take
parenting classes and find adequate housing, and appellant had to obtain employment and
submit to periodic drug testing for several months to show that he was no longer using drugs. 
They did all these things, and CPS returned Julissa and John to the couple in the fall of 2002. 
However, appellant soon lost his job and resumed his substance abuse. Appellant was still
unemployed when Mary Jane was born in January 2003.

 Camacho testified that appellant washed cars and prostituted himself to make money,
but they had trouble coming up with enough money to take care of the family. Appellant and
Camacho shared their apartment with appellant's mother and two men who were acquainted
with appellant's mother. However, appellant's mother, who was a prostitute and drug addict,
often failed to pay her share of the rent. Appellant and Camacho frequently feared that they
would be evicted.

 Camacho was aware that appellant had a male lover, Jose Luis Moreno, who
sometimes provided appellant with money and groceries. Moreno also occasionally supplied
appellant with spray paint, which appellant inhaled to get high, and Camacho would throw
the cans away when appellant brought them into the apartment. Although Camacho was
upset by this situation and sometimes threatened to leave appellant if he did not end his affair
with Moreno, she also understood the value of Moreno's material assistance to the family.

 Appellant and Camacho were under significant stress, but their children were
generally healthy and well-nourished. Appellant and Camacho usually walked with the
children to a nearby charity that served lunch and supper Monday through Friday and lunch
on Saturday. They also received benefits from the Women, Infants, and Children ("WIC")
Program and food stamps.

 Shortly before the offense, appellant and Camacho received a notice informing them
that Julissa's food stamp benefits would be terminated because of a problem with her social
security number. On the day before the offense, the family went to the hospital to get a copy
of Julissa's records. The hospital did not provide them with the records that they needed to
correct the problem.

 While they were taking the bus home from the hospital, appellant started talking to
Camacho about how everyone around them was trying to hurt them. Camacho had not
observed him having any problems with people on the bus before. Appellant told Camacho
that a woman they saw waiting at the bus stop wanted to steal his money. A little girl on the
bus offered a piece of candy to their son, John, but appellant would not let John accept it
because he thought it might be poisoned. After they got off the bus, a woman with dark
marks on her forehead made a rude gesture toward Camacho, and appellant told Camacho
that that was the devil's sign and they needed to hurry home. Camacho believed him and
began crying as they grabbed the children and ran.

 Once they got home, appellant "swept" an egg over Julissa and cracked it into a glass
of water. After looking at the results, appellant said that someone had done something evil
to Julissa. Camacho was so scared that she was not able to sleep that night, and she did not
think that appellant slept, either. They were so frightened that they considered taking the
family to a motel, but they could not find appellant's wallet. Appellant and Camacho
believed that an acquaintance who had been in the apartment earlier that day had stolen it. 
Appellant's missing wallet also contained their share of the month's rent, which was due the
next day.

 Around 2:00 a.m., Camacho was in the bedroom when she heard appellant's mother
coming into the apartment. Appellant asked his mother for her share of the rent, and his
mother told him that she did not have it. Appellant also asked his mother, whom he believed
was a witch, to help him fight off the evil spirits, but his mother did not want to help. She
told appellant that he had the power and he was the one who would have to use it. She left
the apartment around 3:00 a.m.

 Camacho testified that, early in the morning, appellant nailed the back door shut to
keep bad spirits from entering the apartment. He also killed their pet hamsters with a
hammer and bleach because he believed that his mother had worked witchcraft on them and
they were possessed. At some point that morning, appellant began talking about the anti-Christ and an approaching battle between seven good men and seven bad men. He told
Camacho that he was one of the good men. She had not heard him talking that way before. 
Camacho testified that, in the past, appellant had seemed like a normal person except when
he was inhaling spray paint. However, appellant had not inhaled spray paint for five days.

 Later that day, appellant told Camacho that the children were possessed and that he
was going to kill them. When Camacho began to cry, he told her to go into the bathroom so
she would not see anything. He decapitated their two-month-old child, Mary Jane, and then
he screamed for Camacho to help him. Camacho came out of the bathroom and saw that
appellant had placed Julissa on the floor next to Mary Jane's headless body. He was trying
to stab and decapitate Julissa, but she was screaming and struggling. Julissa cried, "Papi,
stop, don't hurt me." Appellant told Camacho to hold Julissa's legs. Camacho did so while
appellant stabbed and decapitated Julissa.

 Appellant then washed the girls' bodies in the kitchen sink and put them into trash
bags. He told Camacho to clean the carpet where he had killed them, and to clean the knife
he had used. Camacho wiped the carpet with one of Julissa's dresses. Appellant put the
girls' heads into a bucket in the kitchen. When he came out of the kitchen, he told Camacho
to have sex with him, saying that he was going to call his friends to come over and rape her
and then he would kill himself. They had sexual intercourse and took a shower together. 
Appellant told Camacho that they would make a pact. He made a cut on his wrist and a cut
on her wrist so that they could complete the pact.

 Camacho further testified that John was asleep in his crib during these events. When
John woke up crying, she went to the bedroom to change his diaper. Appellant came into the
room and told her that John was also possessed. She told appellant "no," and she picked
John up and held him. However, appellant grabbed John from her, took him into the kitchen,
and stabbed and decapitated him. When Camacho saw John's body on the kitchen floor, she
asked appellant to kill her. He tried to choke her or break her neck, but he was not able to
do it. Appellant placed John's body and a plastic bag onto a bed, and he put John's head into
a plastic bag.

 Camacho testified that the couple then walked to the store and bought milk. After
they returned to the apartment and put the milk in the refrigerator, appellant told Camacho
that they would not see each other any more and they would be going to prison forever. They
discussed burying the children's bodies near appellant's grandmother's grave. Camacho
recalled that some time before the offense, appellant had told her that it would be a good idea
to bury the children near his grandmother. They also discussed going to Mexico because it
would be harder for the police to find them there.

 While the couple was sitting in the apartment, appellant's brother, Jose Luis Lopez,
and Camacho's friend, Maria Elena ("Beva"), (13) arrived for a visit. Jose saw John's body on
the bed and started yelling, asking appellant why he did it. Beva also started screaming. Jose
and Beva hurried out of the apartment, saying that they would get help and call the police. 
Camacho and appellant were still waiting in the apartment when Jose and Beva returned with
a police officer, who saw what they had done and arrested them.

 Camacho also testified about her prior statements to police. Camacho's trial
testimony describing appellant's and her delusions was generally consistent with her first
statement to police, but it wholly contradicted her second statement. In her second statement,
Camacho expressly denied that she and appellant had killed the children because of a
delusion that they were possessed. Rather, she stated that she and appellant had killed the
children because they were unable to provide for them and they did not want the children to
suffer.

 Camacho testified that her second statement to police was a lie. She explained that
she provided that statement because the interviewing officer had lied to her about appellant's
statement and she wanted her story to be consistent with his. Camacho also stated that, in
the days following her arrest, she was hearing voices and she was not in her right mind. Her
mental condition improved somewhat after she began taking anti-psychotic medications
while in custody. She was still taking those medications at the time of the retrial.

 Appellant's statements to police were presented to the jury during the testimony of
investigating officers. When investigators first questioned appellant at the police station on
March 11, 2003, he stated, "I killed the kids. What else do you want?" However, he went
on to explain that he killed the children because they were possessed by the spirit of his
deceased grandmother, who spoke to appellant through Julissa and told him that she had
taken Julissa's soul. Julissa removed a piece of tape that appellant had placed over an
electrical outlet and tried to put scissors into the outlet, which frightened him. All three
children started growling and talking to each other like witches.

 Appellant told investigators that Camacho also saw that the children were possessed
and she told appellant to kill them. At first, appellant told Camacho that he did not want to
kill them, but when she told him again to kill the children, he did so. He tried to choke
Julissa while Camacho held her down, but when that did not work, Camacho gave him a
knife. He stabbed Julissa a couple of times, but Julissa got up again. She growled and yelled
at them, saying, "Mom, please tell dad to stop." Appellant then grabbed Julissa and cut off
her head with a cleaver. (14)

 Appellant stated that Camacho then told him to kill the other two children because
they were still acting like they were possessed. Appellant attacked Mary Jane next, but it was
hard to kill her because she was his "own blood." She would not die when he choked her and
stabbed her. Appellant started to cut her head off with a regular kitchen knife because he
could not find the cleaver, which he said must have been hidden by witches, but the knife did
not cut all the way so he tore Mary Jane's head off with his hands. Camacho cried and said,
"Please, not my daughter," but appellant told her that they had to kill the children because
of the evil presence inside them.

 Appellant stated that he and Camacho started to cry, but John was still "acting very
evil." Appellant knew that he would have to kill John last because John was the strongest. 
John growled and yelled, and they both held him down while appellant cut his head off with
a large kitchen knife. Appellant believed that he had to kill the children because his
grandmother's spirit had possessed them.

 Appellant told investigators that, after the children were dead, he and Camacho cried
and talked about killing themselves. Appellant tried to cut himself, but the knife was not
sharp enough. They put the children's bodies and heads into plastic bags. They then
showered to clean off all of the blood, and they had sexual intercourse because they realized
that they would not be together any more. They talked about burying the children in the back
yard of appellant's deceased grandmother's house because she was a witch who would be
able to control their evil power.

 Appellant stated that he told Camacho that they should call the police and tell them
what happened, because "everybody makes mistakes and we are not all perfect." They were
feeling nauseated and sleepy from fumes in the apartment when Jose and Beva arrived. Jose,
who was also "possessed," asked appellant what he had done to the children, and Beva asked
Camacho why she had not called the police. When the police arrived, appellant told the
officer to arrest him.

 Appellant gave a second statement on March 13, 2003, which was videotaped. It
differed somewhat from his initial statement. For example, in his second statement, appellant
did not indicate that Camacho told him to kill the children. Instead, he stated that she was
in another room when he began to choke Julissa, and he called for her to help him hold
Julissa after he was unable to kill her on his own. He also stated that he told Camacho to
bring him the knives that he used to kill the children.

 Appellant added more details in this statement. For example, he related that John was
looking at him in a mean way and "coming at [him]" before appellant started to kill him. 
John continued to move around even after appellant had decapitated him and drowned his
head in a bucket of water, so appellant barricaded the doorway with a table to keep John from
coming out of the room. Appellant added that, after all three children were dead, he
apologized to Camacho, but told her that he had to do it. He told Camacho that he wanted
to make love one last time. At first, she did not want to, but eventually he persuaded her, and
they made love and fell asleep. Appellant was still asleep when Jose arrived. When the
detectives asked appellant why he told the responding officer to arrest him, appellant stated,
"Because I knew we had done bad, both of us, and she admitted it, too." He also said that
if Jose had not shown up, he would have called the police and turned himself in.

 Appellant explained that he killed the children because they were possessed and
because there were fumes in the apartment making him dizzy. He stated that he killed the
children in "a moment of insanity," when he "just snapped." He stated that Camacho was
also insane at the time of the offense. Appellant denied having hallucinations or delusions
prior to that day, and he stated that no one had ever told him before that he was crazy.

 Appellant's relatives and friends testified about his history of hallucinations and
delusions. Appellant's mother and brothers testified that, from the time he was an
adolescent, appellant would tell them that he was seeing things and hearing voices, that God
and his deceased grandmother had told him that he was the "chosen one," and that the world
was coming to an end. Appellant told them that his grandmother wanted him to finish what
she had started. However, one of appellant's brothers acknowledged that he heard appellant
say he was the "chosen one" only when appellant was high.

 Several of appellant's brothers testified that their grandmother had practiced
witchcraft. One brother testified that appellant was very disturbed by an altar or shrine that
they discovered in her bedroom closet while they were living in her house after she died. 
Appellant would tell his brother that he heard voices talking to him in his sleep, and
sometimes he reported hearing the voices while he was awake.

 Georgina Castillo, appellant's former girlfriend, testified that when they lived together
in that house, appellant believed that his grandmother was communicating with him through
his dreams. He would sometimes hear his grandmother calling to him even when he was
awake. Castillo often heard appellant talking in his sleep. Occasionally, she would find him
sleepwalking or sitting at the foot of the bed, and when she woke him, he would tell her
about the things that his grandmother had been saying to him.

 Castillo acknowledged that appellant stopped hearing his grandmother's voice after
they moved out of that house. She testified that she never saw appellant using drugs or
drinking while they were together. After they broke up, however, she saw him intoxicated
"in the street" on two or three occasions.

 Moreno, appellant's male lover, testified that sometimes appellant would say things
that did not make sense, and he would often have seizures during which he seemed to be
blank or absent for a few minutes. Appellant told Moreno that he was the "chosen one" on
several occasions. However, appellant also told Moreno a couple of weeks before the
offense that a person could get away with murder by claiming to be insane. Moreno
acknowledged that he would sometimes give appellant money or groceries. Appellant told
Moreno that Camacho had threatened to leave if appellant did not end the affair, and Moreno
once offered to help appellant move into an apartment without Camacho and the children. 
Less than a month before the offense, appellant told Moreno that he wanted to leave
Camacho and Julissa and move to Austin with Moreno and the younger children.

 On the Saturday before the offense, Moreno stopped by appellant's apartment, but
appellant would not go with him because Julissa was sick with a cold. Moreno stopped by
again on Sunday, but appellant said that he could not go out because Camacho was
threatening to leave him. Moreno stopped by again on Monday, which was the day before
the offense. Appellant again told Moreno that he could not go out because Camacho was
upset, but he said that he would try to persuade Camacho to let him go with Moreno the next
day. When Moreno returned to the apartment the following evening, he saw an ambulance
and police cars. A police officer took him to the police station for questioning, and Moreno
learned that appellant and Camacho had been arrested for killing the children.

 Two people who worked at the charity where the family usually went for meals
testified that appellant never had any problems with other people. He seemed normal and
did not do anything out of the ordinary. He was loving and playful with the children, and he
would feed them first before returning to the serving line for his own food.

 One of appellant's brothers testified that he always thought that appellant loved the
children, and whenever appellant had any money, he would spend it on things for the
children. A few days before the offense, appellant had asked his brother if he could give him
some money or let the family stay with him because they were about to be evicted. Appellant
was always asking his brothers for money, but he seemed worried on this occasion. He
looked sad when his brother told him that he could not help him. However, except for
seeming worried and sad, appellant appeared to be normal.

 Appellant's mental health experts opined that appellant was insane at the time of the
offense. They diagnosed appellant with paranoid schizophrenia and testified that, as a result
of his psychotic delusions, appellant felt compelled to act and was not able to think about the
consequences of his conduct at the time of the offense. They opined generally that appellant
did not know that his conduct was wrong. However, they did not expressly testify that
appellant did not know that his conduct was illegal.

 Dr. William Mark Valverde, a psychiatrist, testified that he first interviewed appellant
in April 2003. He conducted an evaluation, including an investigation into appellant's life
history and the chain of events that led up to the offense. He also evaluated appellant's
demeanor and behavior during the interview. Valverde did not interview any other
witnesses, but he reviewed appellant's school records, psychological test results, and the
videotaped confession.

 Valverde testified that paranoid schizophrenia is harder to identify than other types
of schizophrenia because a person with this disorder may appear rational and engage in
normal conversations until the topic of discussion touches on his area of delusion. Paranoid
schizophrenia does not cause the level of deterioration of the personality that is generally
observed with other types of schizophrenia. Individuals with paranoid schizophrenia
generally appear much more intact and organized than individuals with other types of
schizophrenia.

 Although paranoid schizophrenia is chronic, the symptoms may be better or worse at
different times. Some factors that have been found to exacerbate the symptoms include sleep
deprivation, stress, substance abuse, and medical illness involving fever. On the other hand,
if exacerbating factors are not present, the mental illness might appear to be in remission. 
Therefore, the fact that appellant did not continually report delusions and hallucinations
while he was in custody was not necessarily inconsistent with a diagnosis of paranoid
schizophrenia.

 Valverde testified that a person who is malingering or fabricating a story typically has
difficulty keeping all the details in order, but appellant's repeated accounts of the offense
varied little over the course of multiple interviews. Valverde opined that, at the time of the
offense, appellant was so engrossed in his beliefs that he was engaged in a battle between
good and evil and that evil spirits had possessed the children that he did not know that his
conduct was wrong. However, Valverde acknowledged that, even though appellant felt
compelled to act regardless of the consequences, he might have known that others would
view his conduct as wrong or illegal.

 Valverde stated that appellant's prognosis was poor even with treatment because
paranoid schizophrenia is a chronic mental illness. People with this illness typically lack
insight into their condition and do not recognize that they are mentally ill. They refuse
medication because they are suspicious that others are trying to hurt them or take away their
special powers. In addition, paranoid schizophrenia is less responsive to medication than
other types of schizophrenia. In appellant's case, it was also likely that he had sustained
brain damage from repeated inhalant abuse.

 Valverde acknowledged that he had not seen appellant since 2003. He also
acknowledged that a substance-induced psychosis could cause symptoms similar to those of
paranoid schizophrenia, including disorganized thinking, paranoid delusions, and
hallucinations. He recalled that appellant's family members had testified in prior
proceedings that, when appellant inhaled spray paint, he would not sleep or eat and would
become suspicious and paranoid. However, Valverde did not believe that appellant's
psychotic delusions at the time of the offense were the result of substance abuse because
appellant continued to maintain those delusions six months after his arrest.

 Valverde testified that the most common reasons for fathers to kill their children are
jealousy, financial difficulties, marital discord, and substance abuse. He acknowledged that
these reasons are separate and distinct from psychosis. Fathers kill their stepchildren more
often than they kill their natural children.

 Dr. Raphael Morris, a forensic psychiatrist, first interviewed appellant in 2008. He
interviewed appellant seven or eight times, and he also interviewed many people who knew
appellant. He reviewed psychological test results and the reports of previous mental health
experts. Morris compiled a social history, a family history, and a medical history. He noted
appellant's history of delusional thoughts, the unrealistic way in which appellant
misinterpreted and attached undue significance to things that he saw, and appellant's history
of intense nightmares and sleep disturbances.

 Morris diagnosed appellant with inhalant dependence and marijuana dependence as
well as paranoid schizophrenia. He acknowledged the importance of knowing appellant's
substance abuse history, especially the timing of his last spray paint inhalation before the
offense. However, Morris had been unable to pinpoint the timing of appellant's last spray
paint abuse because appellant's records contained conflicting reports. (15) Therefore Morris
was not sure what role, if any, substance abuse might have played in appellant's symptoms
and in the commission of the offense. Nevertheless, he was of the opinion that appellant's
primary condition was schizophrenia.

 Morris described a pattern of psychological deterioration that began a couple of years
before the offense, in which appellant's ability to function declined as his mental illness
developed. Appellant was the only one of his brothers who graduated from high school, but
since then he had become unable to hold a job or take care of a house. In the weeks leading
up to the offense, appellant misinterpreted other people's conduct and imagined that ordinary
things signified danger and witchcraft.

 Morris also described the stressors that confronted appellant in the days leading up
to the offense, including: the prospect of probation revocation based on his positive drug test
results; Camacho's threat to leave him if he did not stop inhaling spray paint and seeing
Moreno; his ongoing difficulties in paying the rent; his anger toward his mother, who failed
to pay her share of the rent and often came home intoxicated; Julissa's illness; appellant's
and Camacho's general difficulties in taking care of three small children; his lack of sleep
immediately before the offense; and general chaos in his day-to-day life. Morris opined that
these stressors, combined with the onset of acute mental illness, factored into appellant's
commission of the offense.

 In Morris's opinion, at the time appellant committed the offense, he was terrified of
the demons that he believed had invaded his home and possessed his children. He was
completely caught up in his own terror and focused on freeing the children from the demons. 
Because of his psychotic delusion, appellant was not thinking about the wrongfulness of
murdering his children, and he did not understand the consequences of his actions. After he
killed the children and believed that the demonic possession was gone, appellant would have
felt some relief and might have begun considering whether he should have acted differently,
but at the time he was actually committing the offense, appellant was so consumed by his
delusion that he was not able to think about right and wrong.

 On cross-examination, Morris acknowledged that, in his report he discussed whether
appellant knew that his conduct was morally wrong rather than whether he knew it was
illegal. Morris also admitted that he was unaware that, shortly before the offense, appellant
had told Moreno that a person could get away with murder by claiming to be insane and that
this information, if true, might have affected his opinion. Morris was also unaware of
Camacho's testimony that appellant once asked her what she would do if he killed the
children. He acknowledged that he would have wanted to know that information in forming
his opinion.

 However, Morris maintained his opinion that appellant was insane and did not know
that his conduct was wrong at the time of the offense. He pointed out that appellant had
repeatedly provided consistent, detailed accounts of his delusions over a two-year period. 
Also, appellant had not exaggerated his mental illness symptoms or exhibited odd behaviors
while in jail and prison, although such exaggeration would be expected of someone who was
trying to appear to be mentally ill. In addition, appellant refused to take his anti-psychotic
medication, which was not consistent with trying to appear to be mentally ill.

 Morris testified that appellant's recent statement that he no longer believed that he
was the "chosen one" did not undermine Morris's opinion that appellant is schizophrenic and
that, as a result of this disease, he experienced psychotic delusions at the time of the offense. 
A psychotic delusion is a fixed, false belief, in the sense that a person with a psychosis will
remain convinced of his delusion even in the face of evidence to the contrary. However, a
person who suffers from schizophrenia may have different delusions at different times in his
life and may hold those delusions with varying levels of intensity. In this case, the structured
setting of prison might have moderated appellant's symptoms. Even if appellant no longer
expressed the particular grandiose delusion of being the "chosen one," he continued to hold
many of the same paranoid delusions that he held at the time of the offense, and he still had
the same unrealistic, paranoid way of interpreting ordinary things around him.

 The State, on the other hand, presented substantial evidence that appellant was not
legally insane at the time he committed the offense. The first law enforcement officer who
arrived on the scene testified that, when he saw a child's decapitated body in the bedroom
and asked what had happened, appellant held his hands out as if he expected to be
handcuffed and told the officer to arrest him. Guards and administrators who came into
contact with appellant after his arrest testified that appellant did not seem agitated or exhibit
strange behavior. An inmate who had been housed near appellant shortly before the retrial
testified that he overheard appellant saying that he was going to fake mental retardation and
raise an insanity defense. When the inmate stated that appellant was not mentally retarded
or crazy, appellant gestured for him to be quiet, saying, "I know that[,] but they don't." 
Someone asked appellant about a scar on his wrist, and appellant stated that he had tried to
commit suicide after the offense but failed because the knife was not sharp enough.

 Dr. Michael Welner, a forensic psychiatrist, testified as an expert witness for the State. 
He testified that he interviewed appellant for fourteen hours on June 23 and 24 of 2010,
about a month before the retrial. He also interviewed many people who knew appellant. 
Additionally, he reviewed witness statements, transcripts of testimony, appellant's
statements, mental health evaluations, and institutional records.

 Welner identified several instances in which appellant's professed delusions were
contradicted by other things that appellant had said or done. For example, in appellant's first
statement following his arrest, appellant did not claim that he committed the murders because
he was the "chosen one"; instead, he asserted that he killed the children after Camacho
instructed him to do it. Appellant also told officers that he had considered calling the police
right after the offense, reasoning that "everyone makes mistakes." Welner testified that
appellant's deflection of responsibility onto Camacho and his description of the offense as
a "mistake" were indications that appellant was aware that his conduct was wrong. In
addition, appellant's actions immediately after the offense further indicated that he knew his
conduct was wrong. For example, he cleaned up the crime scene, concealed the children's
bodies in trash bags, asked Camacho to forgive him, and had sexual intercourse with
Camacho after telling her that they were going to jail and would not see each other again.

 Welner further noted that appellant told investigators that, while he was committing
the offense, Julissa asked her mother to tell him to stop. Welner opined that appellant's
statement indicated that he recognized Julissa when he killed her; it was not consistent with
his professed delusion that his deceased grandmother had possessed Julissa and was speaking
to him through her body. Appellant also admitted that, when he killed Mary Jane, Camacho
cried and said, "Please, not my daughter." This was inconsistent with his statement that
Camacho had instructed him to kill the children.

 Welner also pointed out that, although appellant stated to investigators that he
believed that Jose and the responding officer were possessed, appellant did not act
aggressively toward them. Welner opined that, if appellant's act of killing the children really
was driven by a psychotic delusion that prevented him from knowing that his conduct was
wrong, then appellant would have been similarly driven to act when confronted by adults
who were possessed; he would not have modified his conduct based on the possessed
person's relative size and strength.

 Welner added that, although appellant asserted that he tried to commit suicide after
the offense, the superficial scratch wound on appellant's wrist was not consistent with a
suicide attempt. Appellant had sharp kitchen knives and a cleaver that he had just used to
stab and decapitate three children. This fact belied his assertion that he could not kill himself
because the knife was not sharp enough. Welner concluded that appellant's representations
about his delusions at the time of the offense were misleading and self-serving.

 Welner opined that appellant did not suffer from a severe mental disease at the time
he committed the offense. When Welner interviewed appellant, appellant's thought patterns
were organized and coherent, his demeanor was open and personable, and he was able to
think abstractly and use humor and idioms appropriately. Welner stated that this presentation
was not consistent with schizophrenia.

 During the interviews, appellant spoke freely and in excessive detail about his sexual
experiences with women, but he was guarded about his homosexual activity. Appellant also
tended to deflect responsibility for his bad conduct onto others. For example, when asked
about an incident in which he beat up his girlfriend's father in her presence, appellant
justified his conduct by explaining that the victim had provoked him by insulting his mother. 
Appellant also discounted the parts of his history that might cast him in a negative light. For
example, he denied and minimized his history of substance abuse, even though his records
showed a history of responding to social disappointment by abusing substances. Appellant
became defensive when confronted with such inconsistencies between his self-report and his
records, but he quickly regained his composure when the conversation shifted to other
subjects. Appellant's conduct of being open about some topics but evasive and defensive
about others indicated a level of social awareness and responsiveness that was not typical of
someone suffering from schizophrenia.

 Welner also testified that appellant's pre-arrest history of delusions and hallucinations
coincided with his history of substance abuse. Except for his sleep disturbances, appellant's
family members indicated that he seemed normal when he was not abusing substances. In
the days leading up to the offense, people who interacted with appellant did not observe
bizarre behaviors, and appellant engaged in social behaviors such as taking the bus and
visiting with friends and relatives. This conduct was not consistent with the social
withdrawal typically associated with the onset of a severe mental disease.

 In addition, Welner testified that a severe mental disease would not switch on and off,
but would be continuous. Appellant took anti-psychotic medications for only a brief part of
the time that he was in custody, but he did not generally exhibit psychotic symptoms. 
Psychotic delusions are fixed beliefs that do not change over time. However, appellant's
descriptions of his delusions, and the strength of his professed belief in them, had evolved. 
Welner opined that this evolution corresponded to changes in appellant's understanding of
the insanity defense.

 In conclusion, the record contains conflicting evidence as to whether appellant was
legally insane at the time he committed the offense. The credibility and weight of this
evidence were within the province of the jury. Appellant had the burden of proving his
affirmative defense by a preponderance of the evidence. The jury's implicit determination
that appellant did not meet this burden was not so against the great weight and preponderance
of the evidence as to be manifestly unjust. Point of error four is overruled.

FUTURE DANGEROUSNESS TESTIMONY

 In his first point of error, appellant asserts that the trial court abused its discretion by
permitting State's witness Alan Brantley to testify as an expert at the punishment phase that
appellant is a continuing threat to society. Specifically, he argues that Brantley's
methodology was not reliable because: (1) there is no relevant scientific community; (2)
Brantley has never tried to show that his methodology produces accurate and consistent
results; (3) his methodology has not been recognized by any peer group; and (4) there is no
basis for his methodology in the relevant scientific literature. Appellant reasons that
Brantley's methodology was similar to the methodology that was employed by the future
dangerousness expert in Coble, (16) which this Court rejected as not sufficiently reliable.

 Brantley testified that he is the president of a behavioral-science consulting business. 
Before he started that business, Brantley was a Supervisory Special Agent for the Federal
Bureau of Investigations ("FBI"), where he had worked for over twenty years. For most of
his career at the FBI, he had been a criminal investigative analyst, responsible for threat
analysis and assessment of dangerousness in violent crime matters. Before he joined the FBI,
he was a senior psychologist for the North Carolina Department of Corrections, where he
provided services to the inmate population as well as evaluations for pre-sentence diagnostic
studies, testing for parole consideration, and evaluations of inmates for assignment to the
governor's mansion.

 Brantley has a Master's degree in counseling and psychology. He has received
specialized professional training and has lectured and taught on the topics of criminal
investigative analysis, crime scene analysis, threat assessment, and assessment of
dangerousness. He has published an article about future dangerousness in a peer-reviewed
journal, and he is a member of several professional organizations. He has testified as a future
dangerousness expert in criminal and civil cases around the country. In Texas, he has
testified on the subject of future dangerousness in seven capital cases.

 Brantley described his criminal investigative analysis as "basically a detailed and
careful review of submitted case materials . . . from [an] investigative, forensic science[,] and
behavior perspective." The purpose of this analysis "is to provide . . . information about
violent criminal behavior that may go beyond the personal and professional life experiences
of those requesting the services." Brantley testified that his methodology "is just a complete
in-depth review of all the case materials."

 In preparing his analysis in this case, Brantley reviewed voluminous materials,
including: crime scene photographs; autopsy photographs; investigative reports and police
reports; mental health evaluations and reports from psychiatrists and psychologists; witness
statements; statements from appellant and Camacho; school records; jail records; Texas
Department of Criminal Justice records which included medical, mental health, and custody-related records; and transcripts from court proceedings. Brantley also interviewed
correctional officers who had knowledge of the security measures and custody classification
system of death row. Based on this information, Brantley organized his assessment into ten
major categories: (1) nature and severity of the offense; (2) history of emotional problems
and mental health complaints; (3) history of drug abuse and arrest; (4) age of onset of
childhood adjustment problems; (5) history of childhood physical and sexual abuse; (6) lack
of remorse and empathy for victims; (7) poor insight and judgment; (8) victim population;
(9) failure to benefit from past intervention efforts; and (10) history of institutionalization.

 Brantley opined that appellant, "when confronted with multiple acute stressors, and
when under the influence of illicit drugs or chemicals, can be very dangerous." The stressors
that confronted appellant at the time of the offense were financial (threat of eviction because
he could not pay the rent), relational (the children's mother was threatening to leave him if
he did not end his affair with Moreno), being physically and psychologically unable to
provide adequate care for the children, and the prospect of going to jail on a probation
revocation. For an individual like appellant, the pressure of those destabilizing influences,
plus the effects of drugs or alcohol, created a lethal combination.

 Brantley stated that if appellant were placed into the general prison population, he
would be exposed to some of the same types of stressors that confronted him at the time of
the offense, and he would have access to illegal substances. In the general population,
appellant would interact with other inmates who had a variety of personalities and agendas,
and based on appellant's history, it was likely that he would have adjustment problems
stemming from money and sex. Appellant's disciplinary records reflected that, even when
he was in the most secure custody level of death row, appellant had set multiple fires and
tested positive for marijuana. There would be increased opportunities for such behavior in
the general population. Brantley testified that there was a high probability that a person like
appellant would commit criminal acts of violence in the future if housed in the general
population.

 On cross-examination, Brantley acknowledged that there is no way to describe a rate
of error with his technique and that his outline was a guide, not a test or psychometric
instrument. He also acknowledged that his expertise was based on his review of relevant
literature and his professional knowledge and experience, rather than clinical testing and
studies. Brantley believed that other similarly qualified professionals would rely on the same
information that he had reviewed and would replicate his findings, although they might not
organize the information into the same ten categories that he used. He acknowledged that
he could not predict violence; he could only assess a probability of dangerousness. He could
not assign a percentage to the likelihood that someone would be violent in the future but
instead described the likelihood as a high, moderate, medium, or low probability.

 Appellant's complaints, and the record of Brantley's testimony, are similar to the
appellant's complaints and the record of Kenneth Lanning's testimony in Nenno. (17) Nenno
complained that the State failed to show the validity of the scientific theories underlying
Lanning's testimony or the validity of the method used for applying the theories, and that
Lanning's testimony did not satisfy all of the Kelly (18) factors. (19) Specifically, Nenno argued
that the State failed to produce any evidence that: (1) the theories underlying Lanning's
testimony were accepted as valid by the relevant scientific community; (2) the alleged
literature on the theories supported his theories; (3) there were specific data or published
articles regarding the area of future dangerousness of prison inmates; (4) his theories had
been empirically tested; (5) he had conducted any studies or independent research in the area
of future dangerousness; or (6) anyone else had tested or evaluated the theories upon which
his testimony was based. (20)

 We disagreed and found that the reliability of Lanning's testimony was sufficiently
established under Texas Rule 702 even though it did not strictly meet all of the Kelly
factors. (21) Kelly's requirement of reliability applies to fields of study aside from the hard
sciences, but with less rigor than to the hard sciences. (22) Rather than addressing the validity
of a "theory" or "technique" in these fields, the appropriate questions are whether: (1) the
field of expertise is a legitimate one; (2) the subject matter of the expert's testimony is within
the scope of that field; and (3) the expert's testimony properly relies upon and/or utilizes the
principles involved in the field. (23) In addition, hard science methods of validation, such as
assessing the potential rate of error or subjecting a theory to peer review, may often be
inappropriate for testing the reliability of fields of expertise outside the hard sciences. (24)

 Lanning was a Supervisory Special Agent in the Behavioral Science Unit of the FBI,
where he had been assigned for fifteen years. (25) He had been with the FBI for over
twenty-five years. (26) Lanning testified that his analysis was based upon his experience
studying cases. (27) He did not contend that he had a particular methodology for determining
future dangerousness. (28) He testified that he studied in excess of a thousand cases that
concerned the issue of future dangerousness in some fashion. (29) His research involved
studying solved cases to attempt to understand the dynamics of what occurred. (30) This
research included personal interviews with inmates, examining the inmates' psychological
records, and examining the facts of the offenses involved. (31)

 From the information he had reviewed about Nenno, Lanning concluded that Nenno
was a pedophile. (32) He testified that such a person was difficult to rehabilitate. (33) After being
given a lengthy hypothetical that matched the facts shown by the evidence, Lanning testified
that an individual matching the hypothetical would be an extreme threat to society. (34)

 As with Lanning, Brantley's expertise came primarily from his years of studying
violent criminal behavior as a law enforcement professional. Brantley similarly did not
purport to apply a scientific methodology, instead acknowledging that his analysis was just
an in-depth review of the case materials. He further acknowledged that the ten categories
he used in his assessment were a means of organizing information, not a test or a
psychometric instrument. Brantley's expertise was not in a "hard science" field, and he did
not hold himself out as a psychiatric expert. Hence, the analysis we adopted in Nenno applies
to this case, and we reach a similar result.

 Contrary to appellant's arguments, the record reflects that Brantley's work in the field
of future dangerousness has been accepted as useful and reliable within his professional
community. Because Brantley did not purport to apply a scientific methodology, he was not
required to show that he had conducted formal testing to verify that his methodology
produces accurate and consistent results. He testified that other professionals similarly
qualified would use the same information he had used and would replicate his findings in this
case. Appellant's claim that Brantley's methodology has not been recognized by any peer
group is unavailing because Brantley did not purport to apply a scientific methodology. (35) 
Further, Brantley testified that he co-authored an article on future dangerousness that was
published in a peer-reviewed journal. Finally, Brantley testified that his expertise is based
on his review of the literature and his professional experience. As such, Brantley's analysis
has a basis in the relevant literature. Brantley sufficiently established the reliability of his
testimony by reference to the standards applicable to his particular professional field. (36)

 This case is readily distinguishable from Coble, in which we held that Dr. Richard
Coons's expert testimony concerning future dangerousness was not admissible under Rule
702 because it was not sufficiently reliable. (37) Coons was a medical doctor and forensic
psychiatrist who purported to apply psychiatric principles in making a forensic psychiatric
assessment of future dangerousness. (38) However, he described a wholly subjective
methodology that he had created for his own use, and he relied solely on materials supplied
by the District Attorney's Office. (39) Coons acknowledged that he did not know of any books
or articles in the fields of psychiatry and psychology that used his factors. (40) He admitted that
other psychiatrists might not apply the factors he had relied upon to assess future
dangerousness, and that they might disagree over the conclusions that could be drawn from
the application of these factors. (41) When the prosecutor read him the names and titles of
articles on future dangerousness that had been cited in a legal brief, Coons was not familiar
with any of them. (42) Nevertheless, the trial court admitted his expert testimony. As a result,
Coons presented his expert opinion to the jury with an aura of scientific certainty that was
not supported by his assessment. (43)

 Unlike Coons, Brantley did not purport to be a psychiatrist or to apply the principles
of forensic psychiatry, and he acknowledged that his methodology was not scientific. 
However, he sufficiently established the reliability of his testimony by reference to the
standards of his particular professional field. We hold that the trial court did not abuse its
discretion by admitting Brantley's testimony. (44) Point of error one is overruled.

10-12 RULE

 In points of error two and three, appellant asserts that Article 37.071's provision for
jury consideration of mitigating evidence violates the Eighth and Fourteenth Amendments
of the United States Constitution and Sections 13, 19, and 29 of the Texas Constitution, and
that the punishment-phase jury instructions violate the Sixth and Eighth Amendments of the
United States Constitution and Sections 15 and 29 of the Texas Constitution. Appellant
argues that the "10-12 Rule" unconstitutionally prevents a single juror from giving effect to
his or her belief that a mitigating factor militates against the imposition of the death penalty. 
He argues that nine or fewer jurors, each of whom may believe in a different mitigating
factor, cannot impose a "Yes" answer on the other jurors to prevent a sentence of death
without violating the trial court's instructions.

 Appellant acknowledges that this Court has consistently rejected these claims, but he
argues that our decisions were based on a fundamental misunderstanding of Mills (45) and
McKoy. (46) He further asserts that we should reconsider our prior opinions because of the
danger that fewer than ten jurors in a hung jury, who have in fact decided that sufficient
mitigating circumstances exist to merit a life sentence, will change their votes in response
to an Allen (47) charge because they will not realize that they have already arrived at a legitimate
result that must be accepted by the court. However, appellant does not allege, and the record
does not reflect, that there was a hung jury or that an Allen charge was given to the jury in
this case.

 We have previously rejected these claims, and appellant has not persuaded us to
reconsider them. (48) Points of error two and three are overruled.

 We affirm the judgment of the trial court.


DELIVERED: October 10, 2012

DO NOT PUBLISH
1. Tex. Penal Code § 19.03(a)(8).
2. Tex. Code Crim. Proc. art. 37.071, § 2(g).
3. Rubio v. State, 241 S.W.3d 1 (Tex. Crim. App. 2007).
4. Tex. Code Crim. Proc. art. 37.071, § 2(h).
5. Tex. Penal Code § 8.01(a); see also Tex. Code Crim. Proc. art. 46.03, §§ 1-3, repealed
by Acts 2005, 79th Leg., ch. 831, § 1.
6. Martinez v. State, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993).
7. Bigby v. State, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994).
8. Ruffin v. State, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008).
9. Id. at 592.
10. Bigby, supra, at 878; see also Graham v. State, 566 S.W.2d 941, 952 (Tex. Crim. App.
1978).
11. Baker v. State, 707 S.W.2d 893, 894 (Tex. Crim. App. 1986).
12. Meraz v. State, 785 S.W.2d 145, 154-55 (Tex. Crim. App. 1990); see also Bigby, supra, at
875.
13. Beva's last name is not in the record.
14. Appellant stated that he cut off Julissa's head with a "machete," but the instrument that was
described by Camacho and introduced at trial through a photograph was a cleaver.
15. Appellant initially told police that he had not used any controlled substance for three months
before the offense, but his probation records showed that he had tested positive for controlled
substances, including marijuana and cocaine, on two occasions during the two months before the
offense. He told Valverde that he inhaled spray paint three days before the offense. Later, he told
another mental health professional that he had inhaled spray paint two days before the offense and
that he probably would not have killed the children if he had not done that. Camacho testified that
appellant had last inhaled spray paint five days before the offense.
16. Coble v. State, 330 S.W.3d 253 (Tex. Crim. App. 2010), cert. denied, 131 S.Ct. 3030 (2011).
17. Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998).
18. Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992).
19. Nenno, supra, at 560.
20. Id.
21. Id. at 562.
22. Id. at 561.
23. Id.
24. Id.
25. Id. at 551, 562 & n.10.
26. Id.
27. Id. at 562.
28. Id.
29. Id.
30. Id.
31. Id.
32. Id. at 551.
33. Id.
34. Id.
35. See Nenno, supra, at 562 ("To the extent that a factfinder could decide that the absence of
peer review cast doubt on the credibility of the testimony, such affects the weight of the evidence
rather than its admissibility").
36. See Coble, supra, at 274 ("Under either Daubert/Kelly or Nenno, reliability should be
evaluated by reference to the standards applicable to the particular professional field in question").
37. See id. at 270.
38. Id.
39. See id. at 271.
40. Id.
41. Id.
42. Id. at 272.
43. Id. at 274 & n.46, 279 & n.68; see also Morris v. State, 361 S.W.3d 649, 674 (Cochran, J.,
concurring) ("As we stated in Coble v. State, the danger with unscientific expertise posing as science
is that the jury will accept it uncritically").
44. Appellant does not contend that Brantley's testimony was inadmissible under Tex. R. Evid.
403. See Nenno, supra, at 560. Therefore we will not address this matter under Rule 403. See Tex.
R. App. P. 33.1(a).
45. Mills v. Maryland, 486 U.S. 367 (1988).
46. McKoy v. North Carolina, 494 U.S. 433 (1990).
47. Allen v. United States, 164 U.S. 492, 501 (1896); see also Barnett v. State, 189 S.W.3d 272,
277 & n.13 (Tex. Crim. App. 2006) ("An Allen charge . . . . reminds the jury that if it is unable to
reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a
second jury would find the issue any easier to resolve").
48. See Williams v. State, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); Smith v. State, 297
S.W.3d 260, 278 (Tex. Crim. App. 2009); Druery v. State, 225 S.W.3d 491, 509 (Tex. Crim. App.
2007).